Craig C. Marchiando (SBN 283829)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
4 Embarcadero Center, #1400
San Francisco, CA 94111
Tel: (757) 930-3660
Fax: (757) 257-3450
craig@clalegal.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ELETTRA MEEKS, JOSEPH DE LA CRUZ, STEPHANIE LAGUNA, and AMBER LEONARD, *on behalf of themselves and others similarly situated*, | Case No.: _____ |
| Plaintiffs, | **PLAINTIFFS' CLASS ACTION COMPLAINT FOR FCRA AND CCRAA VIOLATIONS** |
| v. | **JURY TRIAL DEMANDED** |
| EQUIFAX INFORMATION SERVICES, LLC, | |
| Defendant. | |

The Plaintiffs, Elettra Meeks, Joseph De La Cruz, Stephanie Laguna, and Amber Leonard (collectively "Plaintiffs"), *individually and on behalf of others similarly situated,* by Counsel, hereby file this action against Defendant Equifax Information Services, LLC. In support thereof, Plaintiffs allege as follows:

### PRELIMINARY STATEMENT

1. This action arises from Defendant's reporting of adverse, outdated, and inaccurate information related to illegal payday loans in Plaintiffs' credit reports. Even though these loans were forgiven as part of a nationwide class settlement, Midwest Recovery and Consumer Adjustment Company, Inc. ("CACI") reported these unenforceable debts on Plaintiffs' credit reports in order to coerce repayment of the debts. In addition, Midwest Recovery deceptively "re-aged" the debt, which is a common practice where a creditor or debt collector alters the "date of delinquency"

1

1  to make it appear as a newer debt and, thus, avoid removal of the debt from
2  consumers' credit reports in accordance with the Fair Credit Reporting Act.

3      2.    Similar to this matter, the Federal Trade Commission recently initiated
4  an action against Midwest Recovery for placing "bogus or highly questionable debts
5  onto consumers' credit reports to coerce them to pay the debts."[1]  In its complaint,
6  the FTC alleged that "Midwest Recovery collected more than $24 million from
7  consumers" on these bogus debts, largely by coercing consumers through the
8  negative impacts on their credit reports. *Id.* As the Director of the FTC's Bureau of
9  Consumer Protection explained: Midwest Recovery and its owners "parked fake debt
10 or questionable debts on people's credit reports and then waited for them to notice
11 the damage when they were trying to get a loan or a job" in order to "coerce people
12 to pay debts they didn't owe or didn't recognize." *Id.*

13     3.    Congress enacted the Fair Credit Reporting Act to prevent this type of
14 misconduct. Finding that consumer reporting agencies "have assumed a vital role" in
15 society, Congress sought to "insure that consumer reporting agencies exercise their
16 grave responsibilities with fairness, impartiality, and a respect for the consumer's
17 right to privacy." 15 U.S.C. § 1681(b).

18     4.    The FCRA contains a variety of requirements to to accomplish
19 Congress' goals of protecting consumers, including §§ 1681c and 1681e(a), which
20 are two of the cornerstone provisions of the FCRA. Absent several narrow
21 exceptions, § 1681c prohibits consumer reporting agencies from reporting adverse
22 items of information that antedate the report by more than seven years. This section
23 of the FCRA "reflects a policy choice to allow dated adverse credit data to 'age off'
24 a credit report because such information might otherwise indefinitely hamper the
25 borrowing capabilities of now-reformed individuals." *Beseke v. Equifax Info. Servs.*
26 *LLC*, No. CV 17-4971 (DWF/KMM), 2019 WL 6250756, at *3 (D. Minn. Nov. 22,

27
28
---
[1] *Press Release*, Fed. Tr. Comm'n, *FTC Stops Debt Collector's Alleged "Debt Parking" Scheme, Requires it to Delete Debts it Placed on Consumers' Credit Reports* (Nov. 30, 2020), available at: https://www.ftc.gov/news-events/press-releases/2020/11/ftc-stops-debt-collectors-alleged-debt-parking-scheme-requires-it.

2019) (quoting *Seamans v. Temple Univ.*, 744 F.3d 853, 863 (3d Cir. 2014)). To further strengthen the protections of § 1681c, the FCRA also requires consumer reporting agencies to "maintain reasonable procedures designed to avoid violations" of § 1681c. 15 U.S.C. § 1681e(a).

5.     Here, Equifax disregarded these requirements. It allowed Midwest Recovery to report adverse and outdated information regarding Plaintiffs' accounts, which were more than seven years old. Equifax violated § 1681c because it allowed Midwest Recovery to re-age this adverse information—missed payments, past due amounts, and delinquent payment histories—that should have been removed from Plaintiffs' credit reports within seven years as required by the FCRA. If Equifax had reasonable procedures as required by § 1681e(a), it would have discovered that Midwest Recovery was placing these "bogus or highly questionable debts onto consumers' credit reports to coerce them to pay the debts."[2]

6.     In addition, Equifax never should have allowed Midwest Recovery or CACI to report the debts in the first place because they were cancelled as a result of a nationwide class settlement.[3] Equifax nonetheless allowed debt collectors, such as Midwest Recovery and CACI, to inaccurately report that consumers had outstanding balances on loans *after* the announcement of a nationwide class action settlement.

7.     The class action settlement placed Equifax on notice that the loans were void, and Equifax should have maintained reasonable procedures to ensure that it did not include any information pertaining to these loans in Plaintiffs' or the class members' reports. Indeed, several of the Plaintiffs disputed the accounts with Equifax, explaining that the debt was void and had been the subject of a class action settlement involving Think Finance, Great Plains, Plain Green, and MobiLoans.

---

[2] Press Release, *supra* n.1.

[3] *See generally Gibbs v. Plain Green, LLC*, No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of the class settlement); *see also* David Rees, *Historic settlement sees online lenders wiping out $380 million in debt. Virginians led the way*, The Virginian Pilot, *available at* https://www.pilotonline.com/business/consumer/dp-nw-online-lender-settlement-20191212-n7khtxn7tbbsbauzirehwmpgly-story.html.

Although Equifax deleted the accounts in response to these disputes—a concession of the accuracy of their disputes—it nonetheless continued to report the same inaccurate information regarding other consumers as evidenced by the reports of the other named Plaintiffs.

8.      The reporting of these debts violated § 1681e(b) of the FCRA, which requires consumer reporting agencies to use "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). With respect to California consumers, Equifax's conduct also violated California's Consumer Credit Reporting Agencies Act, which imposes similar obligations on consumer reporting agencies. *See* CAL. CIV. CODE § 1785.14(b).

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and 15 U.S.C. § 1692k(d). The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) as Plaintiff Meeks is a resident of this Division and a substantial part of the events giving rise to Plaintiff Meeks' claims occurred in this Division.

## PARTIES

11.     Plaintiff Elettra Meeks is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c). Ms. Meeks resides in Antioch, California.

12.     Plaintiff Joseph De La Cruz is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c). Mr. De La Cruz resides in Corona, California.

13.     Plaintiff Stephanie Laguna is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c). Ms. Laguna resides in Kansas City, Missouri.

14.     Plaintiff Amber Leonard is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c). Ms. Leonard resides in Rochester, New York.

15.     Defendant Equifax is a corporation with a principal place of business in Atlanta, Georgia. At all times relevant to this complaint, it was a "consumer reporting agency" as defined by the FCRA at 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

### A.     The Statutory Background Regarding FCRA Claims.

16.     Congress enacted the FCRA with the express purpose of ensuring that consumer reporting agencies "exercise their grave responsibilities" in "a manner which is fair and equitable to the consumer, with regard to confidentiality, accuracy, relevancy, and proper utilization" of credit information. 15 U.S.C. § 1681(a)(4), (b).

17.     Although many of the FCRA's provisions focus on accuracy, the FCRA also "aims to protect consumer information by limiting reporting periods for certain types of information to ensure only current and relevant information is disclosed." *Moran v. Screening Pros, LLC*, 943 F.3d 1175, 1186 (9th Cir. 2019).

18.     The FCRA's relevancy requirements, primarily located in § 1681c, accomplish Congress' overarching goal of providing consumers with an opportunity to improve their credit over time. *See* S. Rep. No. 91-517 (1969).

19.     Section 1681c prohibits consumer reporting agencies ("CRAs") from furnishing reports containing outdated and stale information. This section prohibits CRAs from including eight categories of information in a consumer report.

20.     Relevant here, § 1681c(a)(4) prohibits a CRA from reporting accounts "placed for collection or charged to profit and loss which antedate the report by more than seven years." 15 U.S.C. § 1681c(a)(4).

21.     Similarly, § 1681c(a)(5) is a catchall provision that prohibits the reporting "[a]ny other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years." 15 U.S.C. § 1681c(a)(5).

22.    To further strengthen the protections of § 1681c, the FCRA also requires consumer reporting agencies to "maintain reasonable procedures designed to avoid violations" of § 1681c. 15 U.S.C. § 1681e(a).

23.    In addition to these provisions, the FCRA sets out requirements and obligations for consumer reporting and requires that all consumer reports be furnished using "reasonable procedures to assure maximum possible accuracy." 15 U.S.C. § 1681e(b).

24.    Section 1681e(b) imposes a high, and often disregarded, standard on consumer reporting agencies. *See, e.g.*, *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064(AJT/TRJ), 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b), and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'. . . . '[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived'") (quoting *Webster's Third New Int'l Dictionary* 133, 1396, 1771 (1993).

**B.    Allegations Regarding the Class Claims for Violations of §§ 1681c and 1681e(a).**

25.    Because collection accounts are purged from credit reports after seven years, creditors and debt collectors often attempt to "re-age" a debt to make it appear as a newer debt, thereby preventing the aging-off of the debt from the consumer's report. John Ulzheimer, *Born-Again Debt: What Is Re-Aging, and Is It Legal?* (Nov. 13, 2019) (explaining that "[r]e-aging occurs when the 'purge from' date on a derogatory account is changed to be more current than the date of the original default, resulting in the account hanging around on your credit reports longer than allowed under the law").[4]

26.    "Not only does the re-aging cause the negative credit report entry to remain on" the consumer's credit report longer than permitted by the FCRA, but it

---

[4] *Available at:* https://www.thesimpledollar.com/credit/debt-collection/re-aging-debt-collection-accounts-illegal/

also "will most likely have an unfairly negative impact" on the consumer's credit score because "the item will be interpreted as being more recent and not in the distant past." *Id*.

27. This improper continued reporting of debts unfairly, and by design, pressures consumers into paying debts so that they will stop appearing on their credit, dragging down their credit scores.

28. To re-age a debt, creditors or debt collectors typically change the "date of first delinquency" information, which is one of the standard data entry fields on all credit reports with the "Big 3" consumer reporting agencies.

29. Upon information and belief, Equifax has a procedure to suppress the reporting of this information when the date in the "date of 1st delinquency" field antedates the report by more than seven years. In other words, if a creditor requested a copy of a consumer's credit report more than seven and a half years from the "date of 1st delinquency," Equifax's procedures would automatically block the inclusion of the account in the consumer's credit reports.

30. To prevent the suppression of the credit information, a creditor or debt collector simply needs to change the date in the "date of 1st delinquency" field to make that event appear to have occurred more recently.

31. Upon information and belief and as reflected by Plaintiffs' circumstances, Equifax freely allows furnishers to select and/or change the date of first delinquency field without providing any explanation or justification for the initial entry or change.

32. Additionally, upon information and belief, Equifax does not have any policy, practice, or procedure to ensure that it detects when a furnisher re-ages a debt even though Equifax knows that it is a prevalent practice from creditors and debt collectors to re-age debts to keep these adverse items on consumers' reports.

33.     Equifax also knew or should have known that Midwest Recovery was an unreliable source of information and that it placed "bogus or highly questionable debts onto consumers' credit reports to coerce them to pay the debts."[5]

34.     By way of example, the Consumer Financial Protection Bureau's website shows that more than 200 consumers have lodged complaints against Midwest Recovery related to "credit reporting" and 800 complaints related to "debt collection."

35.     These complaints demonstrate that Midwest is an unreliable source of data, including more than 20 specific complaints indicating that "[o]ld information reappears or never goes away."

36.     For example, on June 13, 2018, one consumer filed a complaint indicating that Midwest Recovery was "reporting old debts" and "re-aging them and placing them on my credit report."

37.     Similarly, another consumer complained on July 19, 2020, that Midwest Recovery "has placed this in my credit report several times even though the original debt is over 7 years old and it was disputed and removed from my credit report over 2 years ago!"

38.     On May 29, 2020, another consumer similar complained that "Midwest Recovery Systems has illegally placed this account . . . on my credit reports by using fraudulent, illegal and unfair debt collection practices such as negative re-aging of debt, breaking the statute of limitations in the State of Michigan, communicating false credit information and failing to disclose that I have disputed this debt on several occasions."

39.     Upon information and belief, many consumers have also sent similar disputes directly to Equifax about Midwest Recovery's re-aging of the debts.

40.     Despite these complaints, Equifax continued to allow Midwest Recovery to report information to it and, upon information and belief, without

_____

[5] *Press Release*, *supra* n.1.

establishing reasonable procedures to ensure that Midwest Recovery was providing accurate information to Equifax.

**C.    Allegations Regarding the Class Claim for Violations of § 1681e(b).**

41.    The loans at issue in this case arise from a rent-a-tribe enterprise that was established to evade state usury laws.

42.    For close to eight years, Think Finance operated a rent-a-tribe scheme, which sought to evade the usury laws of certain states by using the Chippewa Cree, Otoe-Missouria, and Tunica-Biloxi Tribe as the conduit for its illegal loans.

43.    Under the tribal lending model, loans were made in the name of Plain Green, Great Plains, and Mobiloans—three entities formed under tribal law to serve as the fronts to disguise Think Finance's role and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of their name, the tribal companies received a nominal fee of the revenue from the loans, but they otherwise had no control over the income, expenses, or day-to-day operations of the businesses.

44.    Even though regulatory enforcement efforts and private lawsuits uncovered their misconduct as early as August 2013, Think Finance and others continued to engage in the scheme even though "[n]o one appear[ed] to seriously dispute" that these rent-a-tribe "loans violated a host of state and federal lending laws." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 669 (4th Cir. 2016).

45.    Extensive litigation against Think Finance and the tribal lenders further placed Equifax on notice about the unenforceability of these debts. As early as August 2013, the New York Department of Financial Services issued a cease and desist letter to 35 online lending companies, including Great Plains.[6] The cease and desist letter was issued after an "extensive" investigation "uncovered that those companies were

---

[6] The Official Website of New York State, Press Room, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

offering payday loans to consumers over the Internet in violation of New York law, including some loans with annual interest rates as high as 1,095 percent." *Id.*

46.     In response, two tribal lending businesses sought declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *See Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

47.     On September 30, 2013, the district court denied the tribal plaintiffs' request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, the loans were "subject to the State's non-discriminatory anti-usury laws." *Id.*

48.     The court reasoned: "There is simply no basis . . . that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id.*

49.     Over the next six years, dozens of cases—including enforcement actions filed by the Attorney General for Pennsylvania and the Consumer Financial Protection Bureau—established that these loans violated state and federal laws. *See e.g.*, *Commonwealth of Pa. v. Think Finance, Inc.*, Case No. 141101359 (removed to federal court and docketed on Dec. 17, 2014); *CFPB v. Think Finance, LLC*, Case No. 4:27-cv-00127-BMM (D. Mon.) (2018); *Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.).[7]

_____

[7] *See also, e.g.*, *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 337 (4th Cir. 2017) ("We conclude that the Great Plains Agreement contains unenforceable choice of law provisions, which are not severable from the broader arbitration agreement and render the entire arbitration agreement unenforceable."); *Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 971 (N.D. Cal. 2019) (holding that the choice-of-law provisions in Plain Green and Great Plains' loan contracts were unenforceable); *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 907 (E.D. Va. 2019) (same), *aff'd*, 967 F.3d 332 (4th Cir. 2020); *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 308 (E.D. Va. 2019) (same), *aff'd sub nom. Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying a motion to dismiss).

50.     As a result of this litigation, the various constituencies involved in the litigation entered into a groundbreaking nationwide class settlement, which canceled the debt. *See generally Gibbs v. Plain Green, LLC*, No. 3:17-cv-495 (E.D. Va.), Final Settlement Agreement at Dkt. 114-1.

51.     Despite the widely known and publicized settlement, Equifax nonetheless allowed debt collectors, such as Midwest Recovery and CACI, to inaccurately report that consumers had outstanding balances on loans originated in the name of Plain Green, Great Plains, and MobiLoans.

52.     This conduct violated the FCRA, which required Equifax to use "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

**D.      Plaintiffs' Experiences.**

53.     Within the past two years, Equifax allowed CACI to report adverse information about Ms. Meeks.

54.     In particular, Equifax allowed CACI to report that Ms. Meeks was seriously past due on a loan originated by MobiLoans, including a past due amount of $1,362.

55.     Equifax allowed CACI's reporting to be added to Ms. Meeks's credit file, even though it knew or should have known that the debt was cancelled as a result of the nationwide settlement.

56.     Ms. Meeks disputed the CACI accounts with Equifax stating that the MobiLoans debt was part of a class action lawsuit and that she did not owe any outstanding balance on the loan.

57.     In response to Ms. Meeks's dispute, Equifax failed to conduct a substantive investigation of her dispute. Instead, it relied entirely on CACI to investigate the dispute and once CACI verified the information it was already reporting, Equifax took no additional steps to investigate or make sure that the information that CACI provided was actually correct.

1    58.    As a result, the inaccurate information regarding the CACI account

2    remained on Ms. Meeks's credit file.

3    59.    To be clear, this information should not have appeared in Ms. Meeks's

4    credit reports after the nationwide class settlement because the debt was canceled.

5    60.    Equifax later changed how it reported the account and listed the original

6    creditor as "Consumer Adjustment" and the debt collector as "Consumer Adjustment

7    Company." This reporting is inaccurate and misleading because MobiLoans is the

8    original creditor.

9    61.    Because of this inaccurate reporting, Ms. Meeks would not be able to

10   demonstrate the invalidity of this collection account to a creditor.

11   62.    Within the past two years, Equifax permitted Midwest Recovery to

12   report adverse information about Mr. De La Cruz.

13   63.    Specifically, Midwest Recovery claimed that Mr. De La Cruz was

14   seriously past due on a loan originated by MobiLoans, including a past due amount

15   of $1,075.

16   64.    Equifax allowed Midwest Recovery's reporting to be added to Mr. De

17   La Cruz's credit file, even though it knew or should have known that the debt was

18   canceled as a result of the nationwide settlement.

19   65.    After Mr. De La Cruz disputed the Midwest Recovery account, Equifax

20   temporarily removed the information from his credit report, but it allowed the same

21   information to be reported by CACI, including the past due balance information.

22   66.    Mr. De La Cruz also disputed Equifax's reporting of the CACI account.

23   However, Equifax failed to delete the account from his credit report.

24   67.    In response, Equifax failed to conduct a substantive investigation of Mr.

25   De La Cruz's dispute. Instead, it relied entirely on CACI to investigate the dispute

26   and once CACI verified the information it was already reporting, Equifax took no

27   additional steps to investigate or make sure that the information that CACI provided

28   was correct.

PLAINTIFF'S COMPLAINT

68. As a result, the inaccurate information regarding the CACI account remained on Mr. De La Cruz's credit file.

69. To be clear, this information should not have appeared in Mr. De La Cruz's credit reports after the nationwide class settlement because the debt was canceled.

70. Within the past two years, Equifax permitted Midwest Recovery to report adverse information about Ms. Laguna.

71. For example, when Ms. Laguna applied for a mortgage on June 4, 2020, Equifax reported a collection account with Midwest Recovery that was seriously past due on a loan originated by Great Plains, including a past due amount of $1,105.

72. Equifax allowed Midwest Recovery's reporting to be added to Ms. Laguna's credit file, even though it knew or should have known that the debt was cancelled as a result of the nationwide settlement.

73. Moreover, this information should not have appeared in Ms. Laguna's credit reports because she stopped paying the illegal loan in 2011 and because it was charged off in May 2012. Because Ms. Laguna did not make any payments on the loan after 2011, the adverse information should not have been reported in her credit reports after seven and a half years.

74. Upon information and belief, Midwest Recovery re-aged the debt to keep the account on Ms. Laguna's credit report for a longer duration and to coerce her into paying the amount outstanding on the loan.

75. On or about July 30, 2020, Ms. Laguna disputed the debt with Equifax, explaining that the debt was void and had been the subject of a class action settlement.

76. Although Equifax deleted the account from Ms. Laguna's file—a concession of the accuracy of her dispute—it nonetheless continued to report the same inaccurate information regarding other consumers as evidenced by the reports of the other named Plaintiffs.

77. Within the past two years, Equifax allowed Midwest Recovery to report adverse information about Ms. Leonard.

78. Equifax reported a collection account with Midwest Recovery that was seriously past due on a loan originated by Great Plains, including a past due amount of $1,572.

79. Equifax allowed Midwest Recovery's reporting to be added to Ms. Leonard's credit file, even though it knew or should have known that the debt was cancelled as a result of the nationwide settlement.

80. Moreover, this information should not have appeared in Ms. Leonard's credit reports because she stopped paying the illegal loan by April 2012 (at the latest) and because it was charged off in September 2012. Because Ms. Leonard did not make any payments on the loan after April 2012, the adverse information should not have been reported in her credit reports after seven and a half years, including when she applied for credit in August 2020.

81. Upon information and belief, Midwest Recovery re-aged the debt to keep the account on Ms. Leonard's credit report for a longer duration and to coerce her into paying the amount outstanding on the loan.

82. In July 2020, Ms. Leonard disputed the debt with Equifax, explaining that the debt was void and had been the subject of a class action settlement.

83. Although Equifax deleted the account from Ms. Leonard's file—a concession of the accuracy of her dispute—it nonetheless continued to report the same inaccurate information regarding other consumers as evidenced by the reports of the other named Plaintiffs.

**E. Equifax's Violations Were Willful.**

84. Equifax's reporting of these accounts and processing of consumer disputes was willful and carried out in reckless disregard for the consumers' rights under the FCRA. Equifax's conduct was willful because it was accomplished through intended procedures that prioritize its own profitability over accuracy.

85. In addition, the willful nature of Equifax's FCRA violations can be established by, for example:

    a.    The FCRA was enacted in 1970; Equifax has had 51 years to become compliant;

    b.    Equifax is a corporation with access to legal advice through its own general counsel's office and/or outside litigation counsel. Yet, there is no contemporaneous evidence that it determined that its conduct was lawful;

    c.    Equifax knew or had reason to know that its conduct was inconsistent with FTC guidance, case law, and the plain language of the FCRA;

    d.    Equifax voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless; and

    e.    Equifax's violations of the FCRA were repeated and systematic.

### CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF FCRA, 15 U.S.C. § 1681c(a)
### (Class Claim)

86. Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

87. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> **1681c Class:** All persons located in the United States (1) for whom Equifax furnished a consumer report; (2) within the two years prior to the filing of this action and during its pendency; (3) containing an account with Midwest Recovery; (4) where the original creditor of the loan was either Plain Green, Great Plains, or MobiLoans; and (5) where the consumer's delinquency commenced more than seven and a half years before the date of the report.

88. Plaintiffs Laguna and Leonard are members of the 1681c(a) Class.

89. **Numerosity.** Fed. R. Civ. P. 23(a)(1). Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Midwest Recovery's internal business records, as well as the records of Plain Green, Great Plains, and MobiLoans, and they may be notified of the pendency of this action by published and/or mailed notice.

90. **Predominance of Common Questions of Law and Fact.** Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether Equifax's conduct violated § 1681c(a) by reporting information that antedated the report by more than seven years; (2) whether Equifax's conduct was willful or negligent violation; and (3) the appropriate amount of damages to be awarded to each consumer.

91. **Typicality.** Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members' claims.

92. **Adequacy of Representation.** Fed. R. Civ. P. 23(a)(4). Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiffs have retained counsel competent and experienced in such litigation and intends, with their counsel, to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interest that might conflict with their vigorous pursuit of this action.

93. **Superiority.** Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual

members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Equifax's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

94. As described above, Equifax reported adverse account information that antedated the report by more than seven years.

95. Equifax violated § 1681c of the FCRA as to Plaintiffs Laguna and Leonard, and each of the class members by adverse account information that antedated the report by more than seven years.

96. Plaintiffs and each putative class member suffered real and actual harm and injury.

97. For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Equifax's files and reports.

98. In each instance, each class member's credit report contained derogatory information that Equifax was legally obligated to remove.

99. Equifax's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Equifax liable under 15 U.S.C. § 1681o.

100.   As a result of these FCRA violations, Equifax is liable for statutory damages from $100.00 to $1,000.00 for Plaintiffs and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

**COUNT TWO:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681e(a)**
**(Class Claim)**

101.   Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

102.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> **1681e(a) Class:** All persons located in the United States (1) for whom Equifax furnished a consumer report; (2) within the two years prior to the filing of this action and during its pendency; (3) containing an account with Midwest Recovery; (4) where the original creditor of the loan was either Plain Green, Great Plains, or MobiLoans; and (5) where the consumer's delinquency commenced more than seven and a half years before the date of the report.

103.   Plaintiffs Laguna and Leonard are members of the 1681e(a) Class.

104.   **Numerosity. FED. R. CIV. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Midwest Recovery's internal business records, as well as the records of Plain Green, Great Plains, and MobiLoans, and they may be notified of the pendency of this action by published and/or mailed notice.

105.   **Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether Equifax's conduct violated § 1681c by reporting information that antedated the report by more than seven years; (2) whether Equifax maintained reasonable procedures designed to

avoid violations of § 1681c; (3) whether Equifax's conduct was willful or negligent violation; and (4) the appropriate amount of damages to be awarded to each consumer.

106.    **Typicality.** FED. R. CIV. P. 23(a)(3). Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members' claims.

107.    **Adequacy of Representation.** FED. R. CIV. P. 23(a)(4). Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiffs have retained counsel competent and experienced in such litigation and intends, with their counsel, to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interest that might conflict with their vigorous pursuit of this action.

108.    **Superiority.** FED. R. CIV. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Equifax's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

109. As described above, Equifax reported adverse account information that antedated the report by more than seven years.

110. Equifax violated § 1681e(a) by failing to maintain any procedure to prevent Midwest Recovery and CACI from altering the information provided in the date of first delinquency field.

111. Upon information and belief, Equifax allows furnishers to systematically change the date of first delinquency field without providing any explanation or justification for the change.

112. Additionally, upon information and belief, Equifax does not have any policy, practice, or procedure to ensure that it detects when a furnisher re-ages a debt even though Equifax knows that it is a prevalent practice from creditors and debt collectors to re-age debts to keep these adverse items on consumers' reports.

113. Plaintiffs and each putative class member suffered real and actual harm and injury.

114. For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Equifax's files and reports.

115. In each instance, each class member's credit report contained derogatory information that Equifax was legally obligated to remove.

116. Equifax's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Equifax liable under 15 U.S.C. § 1681o.

117. As a result of these FCRA violations, Equifax is liable for statutory damages from $100.00 to $1,000.00 for Plaintiffs and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

**COUNT THREE:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681e(b)**
**(Class Claim)**

118. Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

119. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> **1681e(b) Class:** All persons located in the United States (1) for whom Equifax furnished a consumer report; (2) since December 19, 2019; and (3) containing an account where the original creditor of the loan was either Plain Green, Great Plains, or MobiLoans.

120. Plaintiffs are all members of the 1681e(b) Class.

121. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a subclass initially defined as:

> **1681e(b) Subclass:** All persons located in the United States (1) for whom Equifax furnished a consumer report; (2) since December 19, 2019; (3) containing an account where the original creditor of the loan was either Plain Green, Great Plains, or MobiLoans; and (4) that was removed as a result of a dispute.

122. Plaintiffs Laguna, De La Cruz and Leonard are members of this subclass.

123. **Numerosity. FED. R. CIV. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Equifax's internal business records, and they may be notified of the pendency of this action by published and/or mailed notice.

124. **Predominance of Common Questions of Law and Fact. FED. R. CIV. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether Equifax's conduct violated § 1681e(b) by reporting information related to Plain Green, Great Plains, and MobiLoans after the nationwide settlement; (2) whether Equifax maintained

21

1  reasonable procedures designed to avoid violations of § 1681e(b); (3) whether
2  Equifax's conduct was willful or negligent violation; and (4) the appropriate amount
3  of damages to be awarded to each consumer.

4  125. **Typicality.** FED. R. CIV. P. 23(a)(3). Plaintiffs' claims are typical of the
5  claims of each putative class member. Plaintiffs are entitled to relief under the same
6  causes of action as the other putative class members. Additionally, Plaintiffs' claims
7  are based on the same facts and legal theories as each of the class members' claims.

8  126. **Adequacy of Representation.** FED. R. CIV. P. 23(a)(4). Plaintiffs are
9  adequate representatives of the putative class because their interests coincide with,
10  and are not antagonistic to, the interests of the other putative class members. Plaintiffs
11  have retained counsel competent and experienced in such litigation and intends, with
12  their counsel, to continue to prosecute the action vigorously. Plaintiffs and their
13  counsel will fairly and adequately protect the class members' interests. Neither
14  Plaintiffs nor their counsel have any interest that might conflict with their vigorous
15  pursuit of this action.

16  127. **Superiority.** FED. R. CIV. P. 23(b)(3). Questions of law and fact
17  common to the class members predominate over questions affecting only individual
18  members, and a class action is superior to other available methods for fair and
19  efficient adjudication of the controversy. The damages sought by each class member
20  are such that individual prosecution would prove burdensome and expensive. It
21  would be virtually impossible for individual class members to effectively redress the
22  wrongs done to them. Even if the class members could afford individual litigation, it
23  would be an unnecessary burden on the courts. Furthermore, individualized litigation
24  presents a potential for inconsistent or contradictory judgments and increases the
25  delay and expense to all parties and to the court system presented by the legal and
26  factual issues raised by Equifax's conduct. By contrast, the class-action device will
27  result in substantial benefits to the litigants and the Court by allowing the Court to
28  resolve numerous individual claims based upon a single set of proof in a case.

128. As described above, Equifax violated § 1681e(b) of the FCRA by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

129. Plaintiffs and each putative class member suffered real and actual harm and injury.

130. For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Equifax's files and reports.

131. In each instance, each class member's credit report contained derogatory information that Equifax was legally obligated to remove.

132. Equifax's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Equifax liable under 15 U.S.C. § 1681o.

133. As a result of these FCRA violations, Equifax is liable for statutory damages from $100.00 to $1,000.00 for Plaintiffs and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

**COUNT FOUR:**
**VIOLATION OF Cal. Civ. Code § 1785.13(b)**
**(Class Claim)**

134. Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

135. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

**Section 1785.13(b) Class:** All persons located in California (1) for whom Equifax furnished a consumer report; (2) since December 19, 2019; and (3) containing an account where the original creditor of the loan was either Plain Green, Great Plains, or MobiLoans.

136. Plaintiffs Meeks and De La Cruz are members of the § 1785.13(b) Class.

23

137. **Numerosity.** FED. R. CIV. P. 23(a)(1). Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Equifax's internal business records, and they may be notified of the pendency of this action by published and/or mailed notice.

138. **Predominance of Common Questions of Law and Fact.** FED. R. CIV. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether Equifax's conduct violated § 1785.13(b) by reporting loan information from Plain Green, Great Plains, and MobiLoans after the nationwide settlement; (2) whether Equifax's conduct was willful or negligent violation; (3) the appropriate amount of damages to be awarded to each consumer; and (4) whether injunctive relief should be awarded to Plaintiffs and other class members who reside in California.

139. **Typicality.** FED. R. CIV. P. 23(a)(3). Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members' claims.

140. **Adequacy of Representation.** FED. R. CIV. P. 23(a)(4). Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiffs have retained counsel competent and experienced in such litigation and intends, with their counsel, to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interest that might conflict with their vigorous pursuit of this action.

141. **Superiority.** FED. R. CIV. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Equifax's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

142. As described above, Equifax violated § 1785.13(b) of the CCCRA by reporting loan information arising from debts with Plain Green, Great Plains, and MobiLoans after the nationwide settlement in December 2019.

143. Plaintiffs and each putative class member suffered real and actual harm and injury.

144. Equifax's conduct was willful, rendering it liable for actual and punitive damages in an amount to be determined by the Court pursuant to § 1785.31(a)(2) of the CCCRA. In the alternative, the violation was negligent, rendering Equifax liable under § 1785.31(a)(1) of the CCCRA.

145. In addition, Plaintiffs and class members are entitled to injunctive relief pursuant to § 1785.31(b) of the CCCRA. On behalf of themselves and other consumers in California, Plaintiffs seek an order from the Court prohibiting Equifax from continuing to report any loan information arising from debts with Plain Green, Great Plains, and MobiLoans and requiring them to send notice to class members indicating that they will no longer report this information.

**COUNT FIVE:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681i**
**(Individual Claim of Meeks and De La Cruz)**

146. Plaintiffs Meeks and De La Cruz incorporate by reference each of the allegations set forth in the preceding paragraphs.

147. Equifax violated multiple sections of § 1681i, including but not limited to: (1) failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate in violation of § 1681i(a)(1); (2) failing to provide CACI with all the relevant information regarding Plaintiffs Meeks' and De La Cruz's disputes in violation of § 1681i(a)(2); (3) failing to review and consider all relevant information submitted by Plaintiffs Meeks and Delacruz in violation of § 1681i(a)(4); and (4) failing to promptly delete the disputed inaccurate item from Plaintiffs Meeks' and De La Cruz's credit files upon a lawful reinvestigation of § 1681i(a)(5)(A).

148. Because of Equifax's violations of § 1681i, Plaintiffs Meeks and De La Cruz suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other emotional distress.

149. Equifax's violations of § 1681i were willful, rendering it liable to Plaintiffs Meeks and De La Cruz for actual damages, statutory damages, punitive damages, costs, and attorney's fees in an amount to be determined pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax was negligent, entitling Plaintiffs Meeks and De La Cruz to recovery under 15 U.S.C. § 1681o.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendant for: (1) certification for this matter to proceed as a class action under Rule 23; (2) actual, statutory, and/or punitive damages as pled above; (3) for injunctive relief as requested above; (4) for attorneys' litigation expenses and costs of suit; and (5) such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**PLAINTIFFS,**

By: __/s/ Craig C. Marchiando__
Craig C. Marchiando (SBN 283829)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
4 Embarcadero Center, #1400
San Francisco, CA 94111
Tel: (757) 930-3660
Fax: (757) 257-3450
craig@clalegal.com

*Attorney for Plaintiffs*